Delaume Brothers vs. Agar & Lelong.

## No. 57.

### DELAUME BROTHERS v. AGAR & LELONG.

1. "Days of grace are no obstacle to compensation." C. C. 2209.
2. It is only where there has been an adjudication in bankruptcy, or a petition filed to secure such adjudication, that the bankrupt laws of the United States have authority to supersede the general laws of this State.
3. The terms "factor" and "commission merchant" are synonymous.
4. Definition of the term "factor."

5. One who has dealt with a factor may be sued by the principal in his own name for the price of property purchased of such factor; but, ordinarily, he may set up against such principal every defense, set-off, or compensation included, which would have urged against the factor had the suit been in the name of the latter.

6. Good faith is the foundation upon which rests the right to compensate.

7. Where a person purchases *for cash*, he will not be permitted to compensate the price with a pre-existing debt of the vendor.

8. A stipulation for prepayment of the price, or payment at the moment of delivery, is not essential to a cash sale.

9. It is sufficient to constitute such a sale, that there has been no agreement, express or implied, preventing a demand at any moment for the price.

10. Where sugars are sold without express declaration as to the time within which the price is to be paid, and the general usage is, that where the purchaser is of good commercial standing, the price is not demanded for five days, held:

By McGloin, Judge:

The usage entered into, and formed part of the contract, and the sale was one upon a credit, and not for cash.

By Rogers, Judge:

The usage was to consider such sales as made for cash, and the sale in this case should be so considered.

*Appeal from Sixth District Court. Rightor, Judge.*

*A. Grima* for plaintiffs, appellants.
*T. Gilmore & Sons* for defendants.

McGLOIN, J.—Plaintiffs, sugar planters, consigned ten hogsheads of sugar to John I. Adams & Co., wholesale grocers and commission merchants of this city, who sold it in their own name to defendants. At the time John I. Adams & Co. were indebted to Agar & Lelong in a sum far exceeding the price of said sugar, evidenced by a note, whereof the days of grace were running when said sale was made. When the bill for the sugars was rendered in the name of John I. Adams & Co., that firm had suspended, and Agar & Lelong gave immediate notice of their intention to compensate; and, as their defense in this suit, they advance that plea. It is combatted on the grounds:

1st. That the debt of defendant was not due at the time they sought to compensate.

2d. That at the time John I. Adams & Co. were insolvent, and to allow compensation would be to give an unfair preference to Agar & Lelong over other creditors, in violation of the bankrupt laws of the United States.

3d. That the sugar sold was not the property of John I. Adams & Co., and could not, therefore, be applied to the payment of their debts.

4th. That good faith being the foundation upon which rests the right to compensate, and this sale being for *cash*, it would be against good faith and the contract to withhold the price by reason of an old indebtedness.

First—Article 2209 C. C. disposes of this objection, by declaring that "days of grace are no obstacle to compensation."

Second—An examination of Sec. 5073 of the late Bankrupt Law of the United States satisfies us that set-off, instead of being denied in a case like the present, would have been made obligatory. At all events, there has been no adjudication in bankruptcy, or petition filed for that purpose, in which contingencies alone the bankrupt laws of the United States have power to supersede the general laws of the State. Nor are we satisfied that such questions, involving only relative nullities, can be presented in this collateral manner, or by parties who, in their pleadings, repudiate the relation of creditors of John I. Adams & Co., which class alone have the right to complain of the unfair peferences of that firm, if any.

Third—The general rule is that one person's property shall not be applied to the payment of another's debt. But there is another and mastering principle, to the effect that one confiding his property to another, to be by him controlled and disposed of as his own, is estopped from disputing such apparent title to the prejudice of persons who have dealt with the agent in good faith, and in ignorance of the true state of facts. Plaintiffs entrusted their sugar to commission merchants, and such merchants are *factors*, and so affected by legislation and

precedent applicable to agents of that character. Graham *v.* Duckwall, 8 Bush. 12; Perkins *v.* State, 50 Ala. 154. A factor is one who receives goods from another usually at a distance, with authority to sell them in his own name, and without disclosure of principal, which he usually does. Baring *v.* Corrie, 2 B. & Ald. 143; Graham *v.* Duckwall, 8 Bush. 12; Wharton on Agency, § 375; Story on Agency, Secs. 401, 110, 34, 112, 161, 266. The party in real interest being undisclosed as to third persons, the agent is considered the owner and principal in all contracts relative to property he so controls. Story on Agency, Secs. 111, 112, 401, 34.

Where, without special restrictions, a person consigns his property to an agent, possessing by law or usage such powers, he confides it, with authority to control and dispose of the same as his own, and third persons have the right to treat with the agent accordingly. Rathbone *v.* Williams, 7 T. R. 360, (2 Durn & E. 361); George *v.* Clagget, 7 T. R. 359, (2 Durn & E. 359); Stracy *v.* Decy, 7 T. R. 361, (2 Durn & E. 361); Hogan *v.* Shorb, 24 Wend. 461. Although, under such circumstances, the unknown principle may appear and sue, in his own name, upon his agent's contract, he can do so only subject to every defense, compensation or set-off included, which could have been urged against the agent, had the suit been in his name. Same citations. Also, Wharton on Agency, Secs. 405, 465, and authorities in Note 2 to Sec. 465. Such is also the French law upon this subject. Troplong, *Mandat*, No. 524 *et seq.*; Massé, *Droit Commercial*, No. 374 *et seq.*

It is urged that, by custom, planters' sugar alone is sold on the levee of this city, or by broker. Were this satisfactorily shown, the cases of Semenza *v.* Brinsley, 14 E. C. L. R. (18 C. B. *N. S.*) 467; Henry *v.* Marvin, 3 E. D. Smith, 71; Bliss *v.* Bliss, 7 Bosworth 339, and authorities in this last, cited by Robinson, judge, might be applicable. We do not, however, consider such customs established.

Fourth—The principle that good faith is the foundation upon which must rest the right to compromise, is firmly set-

tled under our law. Nolan *v.* Shaw, 6 La. An. 46; Avery *v.* Purvis, Wood & Co. 7 La. An. 35; Gilbeau Bros. *v.* Melançon, 28 La. An. 627; Pardessus, *Droit Commercial,* vol. 1, No. 335; Merlin, *verbo Compensation,* par. 2, No. 11. C. C. Art. 2210, declaring that compensation takes place, whatever be the nature of either debt, except in the cases therein specified, is cited to the contrary. Other sections of the Code, either by expression or implication, annul all contracts, rights and privileges acquired by fraud or deception ; and these are of equal dignity with the article cited, and it must be interpreted so as to harmonize with them.

It seems clear that, where a person purchases and declares, by expression or implication, that he will pay *in cash,* and in face of such a promise attempts to withhold the price under pretext of compensating with an old claim against the vendor, the attempt is in bad faith, and even fraudulent, and the citations, 6 La. An. 46; 28 La. An. 627, and from Pardessus and Merlin would apply.

Nor is it certain that such conduct would not be excluded by the terms of the contract itself. Compensation operates between two *debts.* Where property is alienated, with the understanding that the price is to be paid *in cash,* it would seem that the parties have expressly stipulated that no *debt,* strictly speaking, shall arise between them by virtue of the transaction, and, consequently, that there shall be no compensation. Cash means "*ready money;*" and where it is agreed that the property shall be paid for in such money, it is not a compliance with the contract to extinguish the price with an old indebtedness by way of set-off. Especially pertinent are these considerations when the vendor has particular reasons for requiring actual payment, such, for instance, as in this case, where he knew that in default of stipulation the price might be withheld from him by compensation, and when he was selling the property of another in no manner obligated for his debts. Hogan *v.* Shorb, 24 Wend. 463, is cited in opposition to these views; but we consider them supported by Adams *v.*

O'Connor *et al.*, 100 Mass. 518; Keane *v.* Fisher, 9 La. An. 70; Gilbeau Bros. *v.* Melançon, 28 La. An. 629; Nolan *v.* Shaw, 6 La. An. 46; Pardessus, *Droit Commercial*, vol. 1, No. 335, p. 282. A stipulation for *cash*, or *ready money*, need not be accompanied by another declaring that payment shall be made before, or at the time of, delivery; provided only, that the vendor says or does nothing to preclude himself, or is not by law or usage precluded from demanding the price at any moment he chooses so to do. That such is the spirit, if not the letter, of our law, appears from many of its provisions. Article 2609, C. C., says that an auctioneer, selling for cash, "*may require the price immediately* . before delivery." So, C. C., article 3229 allows a vendor, on sales " not made on credit," to reclaim his property, under certain conditions, within eight days; whereas, one selling for credit must resort to his direct action for rescission, or content himself with the vendor's privilege. Revised Statutes, § 825, makes it a crime for one, who has purchased *for cash*, to dispose of the thing so purchased, and use its proceeds, with intent to cheat, for any purpose other than the payment of the original price. If there can be no *cash sale*, without payment of the price, at or before delivery, it is difficult to conceive the purpose of such a statute. Nor is the seller, under our law, held to the election indicated in Hogan *v.* Shorb, 24 Wend. 461. Articles 1926 and 2046, of our Civil Code, give him choice of three remedies. He may sue for general damages, for specific performance, or for the dissolution of the contract with damages. We cannot see why a person, selling for cash, may not call for the specific performance, by demanding judicially, if necessary, *ready money*, as stipulated, without thereby waiving the rights his foresight had reserved, and which attach, under our law, to sales of that character. To hold that a principal, driven to suit by the fault of a purchaser, claiming in the courts a specific performance under his agent's contract, waives the stipulation for cash, is to hold that the defendant profits by his own wrong, and that the ratification is of a contract different from that which was actually made.

In view of the celerity with which business moves, in present times, it would, in most cases, be doing a vain thing to demand the rescission of the contract and seek for property which had floated beyond reach upon the tide of commerce. And if, under such circumstances, the seller cannot pursue for the price, without thereby forfeiting the advantages given by law to vendors for cash, we have a case both hard and unjust.

The question, therefore, forces itself upon us for determination, despite the delivery of the goods without requiring prepayment, whether this was or was not a sale for cash? The evidence shows that neither at the time of the sale, nor afterwards, was anything said with reference to how and when the price should be paid. We cannot suppose that the vendor contemplated leaving this important matter entirely to the discretion of the purchaser. He must, therefore, have considered that there was something outside the contract which rendered discussion upon this point unnecessary, by reason of its application to and certain determination of the subject. Here is certainly a case to which C. C. Art. 1964, by converse effect, may be applied. " Equity, usage, and law," says the Code, " supply such incidents only as the parties may reasonably be supposed to have been silent upon, from a knowledge that they would be supplied from one of these sources."

We have in this case the reason shown why the parties were silent in this regard. W. H. Renaud, a member of the firm of John I. Adams & Co., testified : " Q. What is the custom in matters of sales of sugar? Are payments made on the spot, at the very moment of sale? A. No ; We collect at the office of the purchaser *five days after the purchase*. Q. That *is the generally accepted custom ?* A. Yes ; with good houses ; with doubtful ones we collect before delivery." Alphonse Tertrou, commission merchant for sale of sugar and cotton, likewise testified : " Q. How are these sales made, for cash or on terms ? A. The custom is to give five days time. Q. Is that what you mean by a *cash* sale ? A. Well, it ought to be cash ; but it is the custom that we never send the bill until five days after the day of the

sale, the day of the sale not included. That is the general custom." Mr. Richard Milliken, a sugar broker, also touches upon this point in his testimony, as follows: " Q. Is it customary to specify guarantee? A. I suppose not; our business is nominally for cash; sugars and molasses are always sold for cash. This is a cash market. Q. In those cash sales when is the money collected? A. The custom *is now* at the end of five days, to a house well known. If it is some one we don't know, we don't sell without the money down on the hogshead. Q. The defendants' (Agar & Lelong) was a firm well known in this city? A. Yes. Q. For a firm of that character five days is generally understood? A. Yes, sir." These three are not contradicted upon this point, either by expression or implication, by any of the other witnesses.

The members of this Court agree upon all the issues involved in this case and discussed in this opinion, except upon the question as to whether the sales under this usage are for cash or upon a credit, in which respect there is a difference of opinion. It will be seen that this usage is one thing as to solvent purchasers and another as to doubtful ones. The solvency of the defendant firm is proven and conceded. Furthermore, permitting, in face of such usage, a purchaser to take possession of the property without requiring prepayment, is a declaration of satisfaction with him as a vendee, and passes the contract under the dominion of the usage as applied to solvent houses. The purchaser thereupon takes, not as a matter of concession, but of right arising from a supplied incident of the contract, all the advantages of the usage. One of these is, that the price is not to be collected until five days after delivery, and the effect is the same as though this clause were written into the contract. It is impossible for me to consider such a sale as being one for *cash*, without satisfying myself that the distinction between *cash* and *credit* is entirely a matter of the length of the delay stipulated.

In striving to reach the true meaning of the word " cash," C. C. 14, directs us to take its "most usual signification." This

word may be employed at all times as the synonym of money in general; but Webster declares that "*primarily*" it means "*ready money, money in chest, or on hand, etc.;*" and in view of the definition of the Code, article 2439, declaring a sale to be the giving of a thing " for a price *in current money,*" the use of this word " *sale*" in conjunction with the word *cash,* so modifies the latter as to exclude the idea of its use as expressive of *money* as a consideration, in contradistinction to goods, property, etc., as in barter. This results, for if any thing but *money* be taken, the contract is not under our law a *sale,* but an " exchange," lease, etc , according to its circumstances. The only sense, therefore, permissible in this connection for the term " *cash* sale," is the primary ` one of a sale for ready money, as distinguished from one upon a credit. Having concluded, that where a person, by expression, or implication, stipulates for *cash,* what he reserves is the right to collect his money, at will, I do not feel justified in going to the extent of intimating that where parties have actually settled upon a definite period, however short, duri g which payment may be withheld, the sale is nevertheless for *cash.* Such a state of facts comes too clearly within Webster's definition of *credit,* No. 11: " time given for payment for lands or' goods sold on trust, as a long or a short credit "

Nor, am I prepared to hold, that parties by calling a sale, which is really upon *credit,* a *cash* one, can change its character. The law deals more with the essential nature of things than with nomenclature; and in the interpretation of contracts, courts must be governed by the definitions known to the law, and not by mistakes of designation upon the part of contractants. Herold *v.* Stockwell, 32 An. 949. I do not express the opinion, that where third persons are not affected, parties may not agree that some, or all, the advantages accorded by law to cash transactions shall attach to their credit sales. But such an unusual intention should clearly appear, and in absence of explicit expression, is not to be inferred from a mere mistake in the use of names. Nor do I discover in this record

anything approaching proof of a custom to consider a sale, essentially on credit, as one for cash, even if such a thing could come within the grasp of custom, and such custom could possess that *reasonableness* essential to the validity of all usages. The loose expressions of the witness Milliken, as to the character of this market, etc., absolutely without corroboration, and beyond the statements of the other witnesses, is certainly not sufficient to establish a feature of the usage, under consideration, so very peculiar.

Nor do I consider these views as conflicting with those expressed by the Supreme Court in Fisher *v.* Keane, 9 La. An. 70, and Bonham *v.* Overton, 6 La. An. 766. These cases were determined respectively in 1854 and 1851. The usage now under discussion seems to have been at both of said periods only in the process of formation. The recital in defendant's brief, in the first mentioned case, shows that some merchants allowed two, others four, five, and even ten days' delay. The Court, therefore, in its opinion, in view of this absence of that concert, resulting in certainty essential to a valid custom, justly declared these delays to be " a mere act of courtesy, and not of right." So, in Bonham *v.* Overton, this undeveloped usage was declared to be a matter " of courtesy, resting in the vendor's discretion."

We will, also, observe that in Keane *v.* Fisher, the clerk of plaintiff swore that in the negotiation the matter of payment was expressly discussed and cash stipulated for; and the Court declares that it was a careful consideration of that testimony which led it to a conclusion. In view of such expression of intention, usage could supply no incident to that particular contract, under the the provisions of C. C. Art. 1964. In this case, there was nothing said upon this point, and the usage, judged by the testimony before us, has since 1854 matured and developed, until it has attained the certainty and universality it then lacked. I believe, therefore, that the sugars in question were not sold for cash, and am of the opinion, that the judgment appealed from should be affirmed.

By reason, therefore, of the failure of the members of this Court to agree as to the character of the judgment which should be rendered, under the law, the judgment appealed from stands affirmed; appellants to pay costs in both courts.

---

ROGERS, J., *dissenting.* The facts in this case, in my opinion, warrant the conclusion that the sales of sugar on the levee, at New Orleans, are cash sales; that the commercial usage is, that when sales are made to persons or firms recognized as solvent, collections are made five days after sale; if not considered solvent, cash upon delivery. By the term cash, we must understand money, and applying the term to sales, we must understand it in a sense distinguishing such transaction from a barter, exchange, or credit sale.

As the custom is well established, and the daily transactions are had in accordance with it, to my mind it would change entirely the character of these business transactions; for when it is understood between the parties that the transaction is for cash, the view of my colleague places upon it an entirely different character, and calls it a credit sale.

The custom of extending the payment for five days is not unreasonable; it is not in violation of law, and courts should, under such circumstances, recognize the force and validity of commercial usage, in order to exactly apply the evident intentions of parties to their contracts.

In 9 An. p. 90, I think this view is expressed by the Supreme Court, and while the facts of the present case differ somewhat from the facts there reported, the legal propositions announced apply with great force. My opinion is that the judgment of the lower court, which was for defendant, should be reversed, and one rendered for plaintiffs.